1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10
11   **SANDRA P.,** [1]                    )   **NO. CV 17-5800-KS**
                          **Plaintiff,**        )
12          **v.**                             )   **MEMORANDUM OPINION AND ORDER**
13                                             )
14   **NANCY A. BERRYHILL**, Acting           )
     **Commissioner of Social Security,**      )
15                          **Defendant.**      )
16   _____  )
17
18                        **INTRODUCTION**
19
20          Plaintiff filed a Complaint on August 4, 2017, seeking review of the denial of her

21   application for a period of disability and Disability Insurance Benefits ("DIB") under Title II

22   of the Social Security Act.  (Dkt. No. 1.)  The parties have consented, pursuant to 28 U.S.C.

23   § 636(c), to proceed before the undersigned United States Magistrate Judge.  (Dkt. Nos. 11-

24   13.)  On October 25, 2018, the parties filed a Joint Stipulation.  (Dkt. No. 31 ("Joint Stip.").)

25   Plaintiff seeks an order reversing the Commissioner's decision and remanding the matter for

26   an immediate award of benefits or, alternatively, for further proceedings.  (Joint Stip. at

27   _____

28   [1]      Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the
     Committee on Court Administration and Case Management of the Judicial Conference of the United States.

                                                   1

38.)  The Commissioner requests that the Administrative Law Judge's decision be affirmed or, in the alternative, remanded for further proceedings.  (*Id.* at 63-64.)  The Court has taken the matter under submission without oral argument.

## SUMMARY OF ADMINISTRATIVE PROCEEDINGS

On January 16, 2014, Plaintiff protectively filed an application for a period of disability and DIB.[2]  (Administrative Record ("AR") 22, 150-51, 152.)  Plaintiff alleged disability commencing on November 7, 2012 due to a bulging disc, pinched nerve, back problems, neck problems, and numbness and tingling in her hands and feet.  (AR 82-83.)  Plaintiff did not include depression and anxiety in her application alleging disability, but she did list them in her Function Report.  (AR 190.)  Her "date last insured" for DIB eligibility was December 31, 2017.  (AR 82.)  After the Commissioner denied Plaintiff's application initially (AR 81, 95-97), Plaintiff requested a hearing (AR 98-99).

At a hearing held on January 12, 2016, at which Plaintiff appeared with her attorney, an Administrative Law Judge ("ALJ") heard testimony from Plaintiff and a vocational expert. (AR 41-80.)  On February 8, 2016, the ALJ issued an unfavorable decision denying Plaintiff's application for a period of disability and DIB.  (AR 19-35.)  On June 9, 2017, the Appeals Council denied Plaintiff's request for review.  (AR 1-4.)

## SUMMARY OF ADMINISTRATIVE DECISION

Applying the five-step sequential evaluation process, the ALJ initially found that Plaintiff met the insured status requirements through December 31, 2017.  (AR 24; 20 C.F.R. § 404.1520.)  The ALJ found at step one that Plaintiff had not engaged in substantial gainful

---

[2]     Plaintiff was 50 years old on the application date and thus met the agency's definition of a person closely approaching advanced age.  *See* 20 C.F.R. § 404.1563(d).

activity since her alleged disability onset date of November 7, 2012. (AR 24.) At step two, the ALJ found that Plaintiff had the following severe impairments: "spine disorder/osteoarthritis; migraine headache; history of carpal tunnel syndrome; and obesity." (AR 24.) The ALJ found that Plaintiff's other medically determinable mental impairments were non-severe. (AR 24.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (AR 26.) The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations:

> "she is limited to lifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently, is limited to standing and/or walking six hours of an eight-hour workday, is limited to sitting six hours of an eight-hour workday, is limited to occasionally kneeling and stooping but can perform all other postural activities on a frequent basis, and is limited to frequently handling, including gripping, with the bilateral upper extremities."

(AR 26.) Based on the testimony of a vocational expert ("VE"), at step four, the ALJ found that Plaintiff could perform her past relevant work as an Accounts Receivable Supervisor and a Medical Coder/Biller. (AR 33.) The ALJ alternatively found at step five that Plaintiff could perform other jobs existing in the national economy in significant numbers. (AR 33-35.) Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 35.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a

3

whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation omitted).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation omitted); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citation omitted).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or that, despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

//

//

//

## DISCUSSION

The parties raise three issues: (1) whether the ALJ properly decided that Plaintiff's mental impairments were not severe (Joint Stip. at 4); (2) whether the ALJ properly decided Plaintiff's limitations related to her upper extremities (*id.*); and (3) whether the ALJ properly evaluated Plaintiff's credibility (*id.*). For the reasons discussed below, the Court concludes that these issues warrant reversal of the ALJ's decision. Because Plaintiff's credibility features in the ALJ's reasoning related to her mental impairments and her upper extremity limitations, the Court addresses this issue first.

## I.  The ALJ Failed to Properly Evaluate Plaintiff's Credibility Regarding Her Subjective Symptom Testimony (Issue Three)

### A.  Plaintiff's Medical Record

On November 7, 2012, Plaintiff slipped and fell at work. (AR 55, 473, 547, 602.) She was in the breakroom helping set up for a potluck. *Id.* While moving furniture, she stepped backwards and slipped on clear plastic mats that were stacked against the wall behind her. *Id.* When she slipped, she fell backward onto her backside, tried to catch herself with her hands, and hit her head on the wall behind her. *Id.* She reported experiencing immediate pain in her hips, back, hands, arms, shoulders, neck, and head. *Id.* Her co-workers witnessed the fall and one of them helped her to her desk. (AR 474.) Plaintiff then reported the injury to her Human Resources department and received a referral to a clinic. *Id.* Plaintiff was taken off of work and her Workers' Compensation case was ultimately settled, including a buyout of Plaintiff's future related medical care, for $25,000. (*See* AR 53, 69, 244, 254, 255, 480, 481.)

Prior to this incident, Plaintiff had a medical history that included carpal tunnel syndrome for which surgery authorization was requested. (AR 265-327, 328-37, 433, 635.)

Plaintiff testified she did not have surgery and that she thought authorization was denied. (AR 60-61.) She also had a history of headaches and had received an electrical shock to the head from her headset at work in 2009. (AR 356, 474, 493.) Plaintiff had also been involved in at least three car accidents between 2005 and 2010. (AR 603.) A history of depression is also present. (AR 391, 601.)

On January 17, 2013, Wanil Yoon, a chiropractor, examined Plaintiff as a primary treating physician in relation to her workers' compensation case. (AR 480.) She complained of depression, anxiety, and anger as well as headaches, neck pain, and back pain. (AR 480.) He diagnosed her with cervical sprain and strain, thoracic sprain and strain, lumbar sprain, strain, and radiculitis, and headaches with blurred vision. (AR 480.) He requested Plaintiff receive psychological treatment for depression and anxiety, a neurological consultation for her headaches and blurred vision, continued physical therapy, referral to a medical doctor, and an MRI and electrodiagnostic studies. (AR 480.) He had already referred her for x-rays of her cervical and thoracic spine which included findings of degenerative disc disease, facet arthrosis, uncovertebral arthrosis, straightening of the cervical lordosis, straightening of the thoracic kyphosis, and spondylosis deformans. (AR 771-76.)

On April 8, 2013, Dr. Gregory Kirkorowicz, M.D. performed a comprehensive neurological evaluation after Plaintiff was referred to him because of her headaches. (AR 473-79.) Physical examination showed Plaintiff had full range of motion of the neck without pain but her lower back was tender and had restricted forward flexion. (AR 475-76.) Neurological examination showed decreased sensation in the first three fingers of both hands and positive Tinel' signs in both wrists. (AR 477.) Dr. Kirkorowicz diagnosed Plaintiff with migraine headaches made worse by her work injury and musculoligamentous injury in the cervical and lumbosacral spine. (AR 477.) "She also shows signs of emotional consequences of the injury, particularly the anxiety and depression." (AR 478.) Dr. Kirkorowicz did not recommend

neurological treatment unless Plaintiff's symptoms got worse, but he did recommend Zoloft. (AR 478.)

A medical progress report from June 11, 2013 noted that Plaintiff did not have insurance. (AR 649.) Plaintiff's medications included tramadol, sertraline or Zoloft, and gabapentin, and flexeril. (AR 175, 189, 197, 535.) She indicated these medications cause side effects such as drowsiness, dizziness, lightheadedness, constipation, thirst, abdominal pain, sweating, and mood changes. (AR 197.)

On June 8, 2014, Dr. Norma Aguila, M.D. performed a psychological evaluation. (AR 487-91.) Plaintiff reported experiencing mood swings, depression, anxiety, anger, and difficulty with concentration and memory. (AR 487.) Plaintiff also reported seeing a workers' compensation doctor one year prior who prescribed her Zoloft which she was currently still taking. (AR 488.) Her mood was "slightly depressed," her affect was "appropriate," and she said she had auditory and visual hallucinations but did not appear to respond to any during the evaluation. (AR 489.) Dr. Aguilar diagnosed Plaintiff with depressive disorder and anxiety disorder and listed her GAF score at 65-70.[3] (AR 490.) Dr. Aguilar opined Plaintiff's ability to follow instructions, interact with people, and comply with job rules was not limited. (AR 490.) She opined that Plaintiff had mild limitations in her ability to respond to changes in a

---

[3]      "GAF" refers to Global Assessment of Functioning. *See Diagnostic and Statistical Manual of Mental Disorders*, 4th ed. ("DSM IV"). GAF scores from 41 through 50 are consistent with "serious" symptoms or serious impairment in social, occupational, or school functioning, including suicidal ideation, inability to keep a job, and lack of friends. *Id.* A score of 51 to 60 signifies "moderate" symptoms, such as flat affect or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or co-workers. *Id.* A score in the range of 61 through 70 denotes some "mild" symptoms, such as depressed mood or mild insomnia, or some difficulty in social, occupational, or school functioning, such as occasional truancy or theft within the household, but indicate that the subject is generally functioning pretty well and has some meaningful interpersonal relationships. *Id.* GAF scores have been described as a "rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998) (citation omitted). However, pursuant to Agency regulations, the GAF scale has no "direct correlation to the severity of requirements in Social Security Administration mental disorder listings." *See* 65 Fed. Reg. 50746, 50764-6. "The DSM V no longer recommends using GAF scores to measure mental health disorders because of their 'conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Olsen v. Comm'r Soc. Sec. Admin.*, 2016 WL 4770038, at *4 (D. Or. Sept. 12, 2016) (quoting DSM-V, 16 (5th ed. 2013)).

work routine and in her ability to respond to usual work pressure. (AR 490.) She also thought Plaintiff would have mild physical limitations in daily activities. (AR 491.) Dr. Aguilar said Plaintiff's prognosis was "good with stabilization." (AR 491.)

On November 5, 2014, Dr. Jeffrey Ho, D.O. examined Plaintiff and issued a Physical Medicine and Rehabilitation Consultation report related to her upper extremities. (AR 493-501, 512-18.) Dr. Ho did not review any of Plaintiff's medical records. (AR 498.) The exam included an electrodiagnostic study. (AR 493.) The exam revealed mostly normal findings (AR 498), although the doctor noted "[s]ensation to light touch is with paresthesias of the hands." (AR 497.) His diagnoses included thoracic back pain, general fatigue, and limb weakness and numbness. (AR 499.) On November 19, 2014, Dr. Ho examined Plaintiff's lower extremities. (AR 526-32.) They too had normal results. (AR 526-32.) Plaintiff reported to Dr. Ho that she had received three injections to her lower back, one to her neck, and two to her head. (AR 535.)

On December 5, 2014, Dr. Albert Simpkins, Jr., M.D. issued his report as the Agreed Medical Evaluator ("AME") in Plaintiff's Workers' Compensation case. (AR 545-64.) Dr. Simpkins examined Plaintiff on October 15, 2014 but waited for the results from Dr. Ho's diagnostic studies, which he had requested by referral, before completing his report. (*See* AR 512, 525, 526, 546, 565-69.) Plaintiff reported receiving three injections to her lumbar spine, one injection to her neck with another recommended, and an injection to her head. (AR 547.) Her current medications included tramadol, Flexeril, gabapentin, sertraline, omeprazole, ibuprofen, and Tylenol. (AR 548.) Plaintiff stated she had pain in her neck, both shoulders, both elbows, both wrists and hands, and her lower back. (AR 548-49.) She reported myriad resulting physical limitations as well as problems with sleeping, nausea, depression, and anxiety. (AR 549.)

//
//

Dr. Simpkins's examination of Plaintiff was largely normal. Dr. Simpkins noted Plaintiff had mild tenderness to palpation of the lower cervical region, the paracervical musculature on the right, the bilateral upper trapezius musculature, both acromioclavicular joints, both medial epicondylar regions, the posterior aspect of both elbows, the dorsal aspect of both wrists, the lumbosacral junction, and the posterior and superior iliac spine bilaterally. (AR 550-54.) Dr. Simpkins stated that during the range of motion testing of Plaintiff's shoulders, she did not "exert maximal effort." (AR 551.) He also reported Plaintiff had no scars on her wrists. (AR 552.) His review of Plaintiff's October 2014 cervical spine MRI noted mild spinal canal stenosis, mild cord compression, flattening of the cord, obliteration of the cerebrospinal fluid, mild foraminal narrowing, and 3-4-millimeter disc spurs at three levels. (AR 555.) His review of Plaintiff's October 2014 lumbar spine MRI noted congenital shortening of the pedicles, "facet arthropathy and subluxation at L4-5 resulting in grade 1 anterolisthesis with severe spinal canal stenosis and crowding of the intrathecal nerve roots," obliteration of the cerebrospinal fluid, tightening of the lateral recess, and disc protrusions. (AR 555.) Dr. Simpkins diagnosed Plaintiff with cervical spine sprain and strain and degenerative disc disease, bilateral chronic elbow strain with medial epicondylitis, bilateral chronic wrist strain, and lumbosacral spine sprain and strain with degenerative disc disease and grade 1 anterolisthesis. (AR 555-56.) He listed her shoulder pain as unrelated to her work injury. (AR 555.)

Dr. Simpkins included his notes from reviewing Plaintiff's medical record.[4] (AR 570-97.) It appears that prior to the work injury, Plaintiff had received a layoff notice. (AR 602; *see also* AR 574.) After Plaintiff's work injury, various medical providers requested various treatments, some of which were authorized and some of which were denied. (AR 572-79.) Physical therapy, chiropractic adjustments, a psychiatric evaluation, internal medicine clearance, a pain management consult, and medication were authorized. (AR 574-80.)

---

[4] Dr. Simpkins references medical records not present in the record.

Lumbar facet joint blocks, occipital nerve blocks, and later requests for psychiatric evaluation and internal medicine were denied. (AR 574-80.) The request for authorization of carpal tunnel release does not appear to have been addressed. (AR 574-80.)

Previously, on May 29, 2014, Dr. Peter Mendelson, M.D., examined Plaintiff for her initial comprehensive pain management evaluation. (AR 607-13.) Plaintiff reported to Dr. Mendelson that she had "throbbing headaches, dizziness, and blurred vision that occur all of the time," pain in her neck that radiated to both hands, and pain in her lower back that radiated to her right foot. (AR 608-09.) Dr. Mendelson noted that Plaintiff's surgical history included three back surgeries in 2013 and a neck surgery in 2014. (AR 609.) He reviewed a couple of Plaintiff's medical reports. (AR 610.) Plaintiff also reported she was not currently taking any medication. (AR 609.) Examination of Plaintiff revealed her head was tender to palpation over her right and left occiput, her cervical spine was tender and had myospasms bilaterally, she had a positive cervical facet test, both upper extremities had decreased sensation and grade 4/5 muscle weakness. (AR 611.) Dr. Mendelson diagnosed Plaintiff with cephalgia, occipital neuralgia, cervicalgia, cervical radiculitis, herniated cervical disc, cervical spine disc degeneration, and cervical facet arthropathy. (AR 611.) Dr. Mendelson requested authorization for Plaintiff to receive cervical epidural steroid injections and bilateral occipital nerve block. (AR 612.)

On December 17, 2014, Dr. Mendelson re-evaluated Plaintiff. (AR 614-17.) The medical report notes that Plaintiff received an injection which made her headaches cease for seven days before they returned "with less frequency and intensity." (AR 615.) The report then states Plaintiff "is to receive another bilateral occipital nerve injection today." (AR 616.) Another report signed by Dr. Mendelson dated January 21, 2015 indicates Plaintiff received another bilateral occipital nerve injection that day. (AR 618-21.)

//

//

On March 4, 2015 Plaintiff reported to Dr. Mendelson that her headaches were "ok" and the pain in her neck was "better," but her lower back was still painful. (AR 622-25.) Dr. Mendelson requested the AME report. (AR 624.) On April 6, 2015, Plaintiff told Dr. Mendelson that she was experiencing headaches again and he gave her another injection. (AR 626-29; 630-31.)

On April 8, 2015, Negin Rameshni, a chiropractor, examined Plaintiff in relation to completing his report on Plaintiff's maximal medical improvement as a primary care physician in her workers' compensation case. (AR 634-45.) Plaintiff reported her cervical spine pain as a five out of ten, her thoracic spine pain as a five out of ten, her lumbar spine pain as a seven out of ten, and her wrist pain as a six out of ten. (AR 635.) This report lists that Plaintiff had surgery for carpal tunnel in 2010 and that she had "well healed surgical scars" on both wrists. (AR 635, 637.) Examination of her cervical spine revealed tenderness and myospasms, decreased range of motion in flexion, extension, lateral bending, and rotation and all with pain, as well as positive bilateral foraminal compression. (AR 637.) Plaintiff's wrists were tender and had positive Tinel's and Phalen's signs. (AR 637.) Palpation of Plaintiff's thoracic spine showed tenderness and myospasms but range of motion was normal. (AR 638.) Plaintiff's lumbar spine also showed tenderness and myospasms as well as a positive straight leg raise test for both legs. (AR 638.) Her lumbar spine range of motion was decreased and caused pain. (AR 638-39.) Mr. Rameshni diagnosed Plaintiff with cervical discopathy and radiculopathy, thoracic strain and sprain, lumbar discopathy and radiculopathy, and bilateral carpal tunnel syndrome. (AR 643.) He deferred disability factors to the AME. (AR 644.)

Plaintiff received treatment from Dr. Mona Shah, M.D. from October 1, 2015 through June 20, 2016. (AR 705-718, 720-831.) Plaintiff continued to report problems related to headaches, neck pain, lower back pain, wrist pain, and depression. Dr. Shah referred her for psychological treatment and for pain management. (AR 816, 825.) Dr. Shah's notes reference Plaintiff receiving injections from the pain management doctor and a referral for neurological

surgery because of MRI findings showing severe cervical foraminal narrowing, moderate to severe narrowing of the central canal, and congenital spinal stenosis. (AR 807, 809.) However, an MRI from April 8, 2016 shows less severe findings. (AR 765-66.) Notes also indicate Plaintiff was dropping things and experiencing tingling and weakness in her upper extremities. (AR 809.)

Plaintiff started seeing Dr. Enrico Balcos, M.D. for psychological treatment in February 2016. (AR 838-40.) He listed Plaintiff's current GAF score as 45 and prescribed medication. (AR 840.) Dr. Balcos treated Plaintiff through May 2016. (AR 834.)

## B. Plaintiff's Testimony

On April 16, 2014, Plaintiff completed a Pain Questionnaire. (AR 188-89.) Plaintiff said she had pain all day, every day, "sometimes even with meds." (AR 188.) She said she had pain in her head, neck, throughout her back, right leg, and both hands. (AR 188.) She described the pain as "aching, piercing, needles and pins, tingling, numb, muscle spasms, sharp, [excruciating]." (AR 188.) She stated the pain affects her sleep and she needs to take a nap once a day for two to three hours. (AR 188.) She added that she dreads going to bed because she cannot get comfortable "because of the pain" and that when she wakes up in the morning, she cannot feel her hands. (AR 189.)

Plaintiff also completed a Function Report on the same day. (AR 190-97.) She wrote she has carpal tunnel syndrome which makes it painful to write or type. (AR 190.) After falling and hitting her head, she said she is unable to focus, has blurred vision, and has neck and back pain. (AR 190.) She indicated she needed six more epidural shots and hand surgery. (AR 190.) She also listed having anxiety and depression. (AR 190.) She said her daily activities included showering, eating, listening to a bible app, napping, putting some dishes in the dishwasher, looking through mail, putting dirty clothes in a hamper, sitting, adding to the

grocery list, and going to doctor's appointments.  (AR 190.)  She also mentioned she sleeps a lot because of her pain pills and depression.  (AR 190.)  Prior to the injury, she said she enjoyed working, reading, social gatherings, playing volleyball, she visited her sister, was active in her church, took guitar lessons, and went to painting classes.  (AR 191.)

Plaintiff said after the injury, she quit everything.  (AR 191.)  She stated that she still attends church, but now she only listens to the worship and sermon.  (AR 194.)  She said she has become antisocial, is grouchy, cries, does not want to talk or get dressed up, and she now feels "fat, old and ugly."  (AR 195.)  She also said she fears her injuries will get worse, she will die young, and she will be poor and homeless.  (AR 196.)  She explained she struggles with or cannot handle certain items of personal care like tying shoe laces, buttoning clothes, turning faucets, curling her hair, and chopping food.  (AR 191.)  She can prepare sandwiches, cereal, cookies, fruit, salads, pasta, and frozen burritos.  (AR 192.)  She can still drive.  (AR 193.)  She can shop but she finishes within thirty minutes.  (AR 193.)  She said she can manage her money but that she had not paid bills in months.  (AR 193.)

Plaintiff testified at the ALJ hearing on January 12, 2016.  (AR 41-80.)  She said she lives in an apartment with her mother and daughter.  (AR 49.)  Plaintiff has a college degree in Political Science.  (AR 51.)  She is right hand dominant and stated she has difficulties using her right hand.  (AR 50.)  She gave examples of activities she either struggles with or cannot do including fastening her bra, tying her shoelaces, chopping vegetables, and performing repetitive motions.  (AR 50.)  She said she can write "something minimal" like a phone number but not a letter.  (AR 50.)  She did not believe she could work at a computer for more than thirty minutes.  (AR 67.)  Plaintiff can still drive an automatic car but because of the pain in her hands, she sometimes drives with only one hand.  (AR 52.)  She sometimes has difficulty with the pedals because of pain in her right leg that extends to her toes.  (AR 52.)

//

//

The ALJ questioned Plaintiff on her history of carpal tunnel syndrome. Specifically, she asked if before the fall at work Plaintiff "had carpal tunnel surgery or any other more basic treatment of that condition?" (AR 60-61.) Plaintiff responded: "No, ma'am. No surgery." (AR 61.) Plaintiff said doctors in the past recommended the surgery, but she did not think it was approved. (AR 61.) Instead, she was put on modified duty at work and her work load was decreased, but she still did not finish her work on time. (AR 63-64.) She said she did not have surgery after the fall at work either. (AR 61.)

Plaintiff has not worked since November 7, 2012, has not looked for work, and has no source of income. (AR 52-53, 58.) Her mother helps her financially and she does not pay rent. (AR 53.) She received General Relief for one month and food stamps for one year. (AR 53.) She testified that for the last year and a half, she got food from a food bank. (AR 53.) She also testified that she filed a Workers' Compensation case related to her injury on November 7, 2012 and received a settlement in August 2015 and another settlement in December 2015. (AR 53.) The settlement included a buyout of Plaintiff's future medical treatment. (AR 69.) She has been using private insurance since the settlement. (AR 69.)

Plaintiff described her fall at work in November 2012. (AR 55.) When asked what parts of her body were injured, she responded: "my back, my mid back, my neck, my back, my head, my arms, my hands." (AR 55.) Plaintiff said she experienced headaches after the fall but did not recall being diagnosed with migraines after the fall. (AR 56.) She said she thought she was diagnosed with migraines "a long time ago." (AR 56.) She did not remember if she was taking any special medications for migraine headaches. (AR 56.) One of Plaintiff's chiropractors prescribed a back brace for her which she said she had on at the hearing. (AR 56-57.)

Plaintiff testified about a myriad of symptoms that prevented her from working. She experiences pain every day. (AR 57.) She is not able to do things she used to be able to do.

14

(AR 57.)  Her medications help in some ways but create other problems through side-effects like nausea, constipation, and diarrhea.  (AR 57.)  She cannot concentrate because pain interrupts her sleep.  (AR 57.)  She worries about bills and providing for her family.  (AR 57.)  She feels like she is not the same anymore.  (AR 57.)

She also discussed her mental impairments.  Plaintiff said she has depression and anxiety and that she alternates between feeling depressed, anxious, stressed, and also feeling nothing.  (AR 58.)  She said she received a prescription for depression medication three years ago, after the fall in November 2012.  (AR 58-59.)  When asked if the medication helped, she related that it sometimes does but that her prescription dosage had also been increased.  (AR 59; *see* AR 664, 836, 837,840.)  When asked if she had any other treatment like counseling, she explained she was allowed to see one doctor one time under Workers' Compensation which is when she was first prescribed medication.  (AR 59.)  She said another request for authorization of treatment was denied.  (AR 59.)  Insurance later gave her names of doctors she contacted but she had yet to receive a call back.  (AR 59.)  Her primary care provider, Dr. Shah, whom she was scheduled to see in two weeks, had promised to find her a doctor close to home.  (AR 59-60.)

The ALJ then questioned Plaintiff about her headaches again.  Plaintiff said she experienced headaches every day.  (AR 60.)  She admitted to experiencing them once a week before the November 2012 incident, but said they are now constant.  (AR 60.)  When asked about her headache medication this time, she remembered she takes gabapentin, prescription strength ibuprofen, and Tylenol.  (AR 60.)  She forgot to mention she received injections to her head and neck.

Plaintiff also discussed the treatment that she received for her back pain.  She stated that surgery had not been recommended.  (AR 61.)  She listed the treatments she had received, including aqua therapy, acupuncture, "physical therapy, exercises, the medicine, and the

15

creams, and the hot pads, the cold with the ice machine, Heat Waves.  I believe it's called Heat Waves.  I have that machine at home.  I believe that's about it.  Maybe a couple more things I'm forgetting what their names are."  (AR 61.)

The ALJ then asked Plaintiff to discuss the medications that she takes.  (AR 62.)  The ALJ noted they had already covered prescription strength ibuprofen, Tylenol, gabapentin, and Zoloft or Sertraline.  (AR 61.)  Plaintiff added she takes allergy medications and Pantoprazole for bloating, but she thought that was it.  (AR 62.)

## C.     Applicable Law

An ALJ must make two findings before determining that a claimant's pain or symptom testimony is not credible.[5]  *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1102 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  "Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record.  *Treichler*, 775 F.3d at 1102 (citation omitted); *see also Marsh v. Colvin*, 792 F.3d 1170, 1174 n.2 (9th Cir. 2015); *Carmickle v. Comm'r, SSA*, 533

---

[5]        Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p, which required the ALJ to assess the credibility of a claimant's statements.  SSR 16-3p focuses on the existence of medical cause and an evaluation of "the consistency of the individual's statements about the intensity, persistence, or limiting effects of symptoms with the evidence of record without consideration of the claimant's overall 'character or truthfulness'."  *See* Guide to SSA Changes in Regulations and Rulings 2016-17, June 2017. The revision is not applicable to Plaintiff's application here, because the ALJ rendered her decision on February 8, 2016, before the effective date.  (AR 19-35.)  But the Ninth Circuit has acknowledged that SSR16-3p is consistent with existing precedent that requires that the assessments of an individual's testimony be focused on evaluating the "intensity and persistence of symptoms" after the ALJ has found that the individual has medically determinable impairments that could reasonably be expected to produce those symptoms.  *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017).

F.3d 1155, 1161 (9th Cir. 2008) (court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear-and-convincing standard").

In weighing a plaintiff's credibility, the ALJ may consider a number of factors, including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony . . . that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted). The ALJ must also "specifically identify the testimony [from the claimant that] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler*, 775 F.3d at 1102 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)). "General findings are insufficient." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

### D.    Analysis

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (AR 28.) The ALJ did not state that she found evidence of Plaintiff malingering. Accordingly, the ALJ needed to provide clear and convincing reasons to reject Plaintiff's credibility. *Treichler*, 775 F.3d at 1102. The ALJ gave several reasons for rejecting Plaintiff's credibility concerning her subjective symptom testimony. (AR 28-33.)

The first reason the ALJ gave for rejecting Plaintiff's credibility was the objective medical evidence did not support the severity of impairment that Plaintiff alleged. (AR 28.) The ALJ noted that imaging studies showed "abnormalities in the cervical spine and lumbar spine," but these imaging studies were not sufficient on their own to "substantially support the

alleged degree of impairment severity." (AR 30.) The ALJ also noted Plaintiff's suboptimal effort during examination, inconsistent Tinel's signs, normal gait, normal muscle strength, normal updated electrodiagnostic studies, lack of referrals for treatment of headaches, no hospitalizations, and no current recommendations for surgery as evidence that the record lacks substantial support of the severity of Plaintiff's impairments. (AR 30-31.) While every objective test may not have revealed all of Plaintiff's alleged impairments, the ALJ found there were objective tests that did. Plaintiff is only required to provide objective medical evidence of a medical impairment; the objective medical evidence does not need to prove the degree of pain Plaintiff alleges. *See Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc) (citation omitted). People have different levels of pain tolerance and pain "cannot be objectively verified or measured." *Bunnell*, 947 F.2d at 347 (quoting *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989)). Thus, it was improper for the ALJ to rely on a lack of objective medical evidence supporting the degree of Plaintiff's pain to reject her credibility concerning the severity of her symptoms.

The second reason the ALJ relied on to reject Plaintiff's credibility was Plaintiff's conservative treatment. (AR 28, 30.) "[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment." *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Orn*, 495 F.3d at 638). "Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated…. We have previously doubted that epidural steroid shots to the neck and lower back qualify as conservative medical treatment." *Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) (citing *Garrison v. Colvin*, 759 F.3d 995, 1015 n.20 (9th Cir. 2014)). Failure to seek treatment because of an inability to afford it is not a permissible reason to reject a Plaintiff's credibility. *Regennitter v. Comm'r of SSA*, 166 F.3d 1294, 1296-97 (9th Cir. 1999). Additionally, failure to seek treatment for mental illness is not always a permissible reason to reject a claimant's credibility because "it is a questionable practice to

chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *See Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)).

Plaintiff has received physical therapy, narcotic pain medication, and injections to her head, neck, and back. Her doctor requested that she undergo surgery for carpal tunnel syndrome, but the insurance company did not authorize the surgery. (AR 336, 433, 576-77.) Plaintiff testified in relation to her mental health issues that she was only allowed to see a psychiatric specialist once under the workers' compensation insurance. (AR 59, 480, 488, 575, 576.) She also testified she has not worked since the injury and does not have another source of income. (AR 52.) These facts indicate Plaintiff received all the treatment that the insurance company authorized and her reason for not seeking more aggressive physical treatment or comprehensive mental health treatment was the insurance company would not authorize it and she did not have the means to afford it. After the workers' compensation case settled, Plaintiff appears to have purchased medical insurance and sought more treatment. (AR 69.) Accordingly, this is not a clear and convincing reason for the ALJ to reject Plaintiff's credibility.

The third reason the ALJ mentioned for rejecting Plaintiff's credibility was that the progress notes and reports from her treating and examining sources do not support the medication side effects that Plaintiff alleged she suffers. (AR 30.) She reported trouble sleeping, upset stomach, and "symptoms of depression and anxiety" to Dr. Simpkins. (AR 549.) She reported nausea, depression, anxiety, and anger to Dr. Kirkorowicz. (AR 474.) She reported mood swings, sleeping a lot, and irregular appetite to Dr. Aguilar. (AR 487-88.) She reported dizziness to Dr. Mendelson but she also said she was not taking any medications at that time. (AR 608-09.) She sought treatment for stomach pain. (AR 646, 648.) The record does not appear to contain any evidence of reported sweating. However, because the record does reflect that Plaintiff did report issues with tiredness, nausea, and mood swings, this was

not a clear and convincing reason for the ALJ to reject Plaintiff's credibility on all of her alleged medication side effects.

The fourth reason the ALJ provided for rejecting Plaintiff's credibility was her activities of daily living. (AR 30.) The ALJ listed Plaintiff's daily activities to include living with family, showering, eating, listening to Bible apps, putting dishes in the dishwasher, going through mail, putting clothes in a hamper, writing a grocery list, typing, going to medical appointments, driving, attending church, and talking on the phone. (AR 31.) Activities of daily living that contradict alleged physical limitations are a reason to discount a Plaintiff's pain testimony. *See Tommasetti*, 533 F.3d at 1039. That said, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). The activities listed by the ALJ do not equate to being able to handle the mental demands of a job. Living with family members does not necessarily require the same level of acceptable social skills as getting along with co-workers, supervisors, or members of the general public. Attending church also does not necessarily require social interaction beyond a polite greeting. Accordingly, none of these activities provide a clear and convincing reason to reject Plaintiff's allegations concerning her mental impairments.

In relation to physical limitations, none of these daily activities described by Plaintiff require sustained physical activity either. Plaintiff reported she does not drive for very long periods of time. (*See* AR 51, 193, 215, 604.) The meals she prepares are simple. (*See* AR 192.) Many of the activities the ALJ listed require minimal exertion and the Ninth Circuit has already made clear that disability does not require resting in bed all day. *Garrison*, 759 F.3d at 1016 (citations omitted). As Plaintiff describes it, her activities have been significantly curtailed since her injury. (*See* AR 190-91, 600-01, 603-04.) The ALJ fails to show how

Plaintiff's remaining daily activities undermine her allegations of pain. Accordingly, this also is not a clear and convincing reason to reject Plaintiff's credibility.

Another reason the ALJ gave for rejecting Plaintiff's allegations of the severity of her pain was that she worked with all of these conditions prior to the injury. (AR 28.) While Plaintiff was working with impairments prior to her injury, her work had been modified to a reduced workload with regular breaks and she was still failing to meet her supervisor's expectations. (AR 63-64.) Then she suffered an injury which she alleges and the AME agrees made at least some of her pre-existing impairments worse. (*See* AR 57, 60, 82-83, 555-58, 563.) Additionally, Plaintiff has been diagnosed with degenerative disc disease in her cervical and lumbar spine, which indicates her condition worsens over time. (*See* AR 555-56, 771.) Accordingly, Plaintiff's working *prior* to her injury is not a clear and convincing reason to reject her credibility concerning the severity of her pain after the injury.

None of the reasons the ALJ relies on to reject Plaintiff's testimony regarding the severity of her limitations resulting from her impairments satisfy the clear and convincing standard. Rejection of Plaintiff's credibility was thus legal error and was not harmless because it is not clear that Plaintiff would still have been found not disabled if her credibility had been properly assessed. Accordingly this issue warrants remand.

The ALJ in part relied on her determination of Plaintiff's credibility in her analysis of the remaining two issues raised by the parties, i.e., Plaintiff's mental impairments being nonsevere and Plaintiff's upper extremity limitations. (AR 28-33.) Because the issue of Plaintiff's credibility is being remanded, the Court exercises its discretion to remand these two other issues as well without analysis beyond what has already been discussed. Because the record could benefit from further development, especially as various doctors' opinions appear to cite to medical records not present in the record and the ALJ did not discuss one of Plaintiff's treating physicians, Dr. Mendelson, this case does not warrant an immediate award of benefits.

21

*See Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (citation omitted). There is serious doubt as to whether Plaintiff is disabled, but the ALJ erred in her analysis of Plaintiff's credibility. Accordingly, this case is remanded for further administrative proceedings consistent with this opinion.

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED AND REMANDED for further administrative proceedings consistent with this Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and counsel for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: December 28, 2018

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE